IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ROME DIVISION

UNITED STATES OF AMERICA

v.

PAUL EDWARD GREEN,

Defendant.

CRIMINAL ACTION FILE
NO.  4:10-CR-21-RLV-WEJ

## NON-FINAL REPORT & RECOMMENDATION

This matter is before the Court on defendant Paul Edward Green's Motions to Suppress Evidence and Statements [12].  The Court conducted an evidentiary hearing on said Motions August 11, 2010 [21], which has been transcribed [22].  On the basis of the testimony and evidence produced at that hearing, the undersigned **REPORTS** that defendant's Fourth Amendment rights were violated by the entry of officers into his residence without a warrant.  Therefore, the undersigned **RECOMMENDS** that defendant's Motion to Suppress Evidence be **GRANTED**.[1]

---

[1] After hearing his Miranda rights, the defendant demanded a lawyer and asserted that officers had entered his residence without a search warrant. (Tr. 19-27.) There being no statements to suppress (id. at 96), the defendant has abandoned that portion of his motion challenging the voluntariness of his statements under Jackson v. Denno, 378 U.S. 368, 376-77 (1964).

## I.    STATEMENT OF FACTS

### A.    The 911 Calls

On April 25, 2010, at approximately 2:21 p.m., Mildred Green (defendant's mother) contacted Whitfield County 911 and requested that an ambulance be sent to 364 Strain Road in Cohutta, because her son (age 62) was hallucinating, seeing "little green men" everywhere, and "hurting bad" in his chest and "hurting all over."[2]  She reported that her son had been recently released from the hospital, but he had not been drinking and was not being violent.  The 911 dispatcher sent an EMS unit to the scene at 2:25 p.m., which arrived at approximately 2:33 p.m.  (Gov't Ex. 1 (audio recording); see also Tr. 7-10.)  Whitfield County Deputy Sheriff Chip Hackney arrived at the scene at approximately 2:38 p.m.  (Tr. 10.)  EMS subsequently transported the defendant to Hamilton Medical Center at about 2:44 p.m.  (Id. at 10-11.)  Up to this point, no law enforcement officers had entered the defendant's residence.  (Id. at 18, 27-28.)

---

[2] Detective DeWayne Holmes of the Whitfield County Sheriff's Department, who has worked in narcotics investigations since 2004, testified that hallucinations are consistent with drug use.  (Tr. 5, 10-11.)

After the EMS unit removed the defendant, his nephew, Matthew Green,[3] contacted 911 again at about 2:56 p.m., and reported that EMS and a deputy sheriff had recently been at his location. He relayed to the dispatcher that, as he was closing up his uncle's apartment (at 364 Strain Road), he stumbled upon "a lot" of methamphetamine. He wanted to speak to a deputy because he did not know what to do with it. The dispatcher reported that a deputy would be sent back out to the location. (Gov't Ex. 1 (audio recording); see also Tr. 11-12.) Whitfield County Deputy Sheriffs Jimmy Davenport and Lee Teems responded to the call. (Id. at 12, 28-29, 37-38.)

### B.   Entry Into the Defendant's Residence

When Deputy Davenport arrived at the Strain Road address, he was met in the gravel driveway by Mr. Green (who is approximately 25-30 years old). (Tr. 39-40, 42.)[4] He noticed a mobile home to his left, an older woman (Mrs. Green) sitting under a shed directly in front of him, and some young children playing nearby. (Id.

---

[3] Given the number of family members here, the Court refers to Paul Edward Green as the defendant; to his nephew, Matthew Green, as Mr. Green; and to his mother, Mildred Green, as Mrs. Green.

[4] Deputy Davenport arrived first, followed in a separate car by Deputy Teems. They both pulled their patrol cars into the driveway. (Tr. 40-41.)

3

at 41-42.)  Deputy Davenport exited his vehicle, introduced himself to Mr. Green, and asked how he could help.  (Id. at 39, 42.)  Mr. Green explained that officers had been to the residence earlier that day and had transported his uncle (the defendant) to the hospital because he was hallucinating.  (Id.)

Mr. Green explained that, as he was locking up his uncle's apartment[5] and making sure that nothing had been left on (like lights or appliances), he tripped over (or knocked over) a shoe box located under the corner of the defendant's bed, which he suspected contained drugs.  (Tr. 43-44, 60.)  Mr. Green related that he was locking up the apartment because his uncle had gone to the hospital and would not be coming back soon.  (Id. at 60.)  Deputy Davenport conceded that this fact was an indication that the apartment belonged to the defendant and not to Mr. Green.  (Id.)

Mr. Green then invited Deputy Davenport inside his uncle's residence, stating, "I will show you what I seen."  (Tr. 44; see also id. at 45 (deputy construed nephew's

---

[5] Mr. Green did not tell Deputy Davenport that he had been instructed to lock up the apartment; the deputy assumed that Mr. Green had authority to do so.  (Tr. 43.)  There was no evidence, however, that Mr. Green had a key to his uncle's apartment or that the defendant had entrusted the care of his apartment to his nephew.

4

words as an "invitation").)[6]   Deputy Davenport assumed that Mr. Green had authority to "lock things up," and that he had permission to be in his uncle's apartment.   (Id. at 46, 59.)[7]   According to the officer, Mr. Green appeared comfortable in the surroundings and was familiar with the area.   (Id. at 46-47.) Deputy Davenport conceded, however, that he assumed Mr. Green had the right to be in the defendant's apartment based on the simple fact that he had been in there. (Id. at 59.)   Deputy Davenport did not ask Mr. Green if the apartment was his or whether he had permission to allow others to enter.   (Id. at 60.)

Mr. Green opened the screen door to allow Deputy Davenport to enter the porch, then walked by him to open the door that led into the defendant's apartment. (Tr. 47-49; see also Gov't Exs. 3 and 10.)   He relayed to the deputies that the drugs were in the back bedroom.   (Id. at 49.)   Mr. Green crossed the threshold first, followed by Deputies Davenport and Teems, and led the officers directly through the

----

[6] This conversation occurred near where Mrs. Green was sitting.   (Tr. 45.) Before Mr. Green issued his invitation, he related to Deputy Davenport that he and his grandmother had debated whether to call the police about what he had found in the apartment.   (Id. at 45-46.)

[7] Deputy Davenport admitted that he was unaware that, on the 911 call, Mr. Green had identified his residence as being different from the residence belonging to the defendant.   (Tr. 59-60.)

living area to the defendant's bedroom.  (Id. at 29, 49-50, 54-55.)  Once in the

bedroom, Mr. Green repeated that he had been checking his uncle's place to make

sure nothing had been left on and to lock it up when his foot kicked out a shoe box

from under the bed, and because he was nosey, he opened the box.  (Id. at 50-51.)

After encountering what he believed to be methamphetamine, Mr. Green repeated

that he had spoken to Mrs. Green about what to do (which had resulted in the second

911 call).  (Id. at 51; see supra note 6.)

The shoe box was sitting near the corner of the defendant's bed.  (Tr. 53; see

also Gov't Exs. 11-12.)  Deputy Davenport examined the contents of the open shoe

box, and from his training and years of experience in law enforcement, suspected it

contained methamphetamine.  (Tr. 51-52.)  He then remarked that everyone should

leave the apartment while he obtained a search warrant.  (Id. at 51, 60-61.)[8]  Neither

Deputy Davenport nor Deputy Teems touched the contents of the box.  (Id. at 53, 56-

57.)

After exiting the apartment, Deputy Davenport, Deputy Teems, and Mr. Green

returned to the area near where Mrs. Green was sitting (i.e., under the shed near the

---

[8] It is clear from Deputy Davenport's testimony that he had not considered obtaining a search warrant for the defendant's apartment until after he observed the illegal drugs for himself.

6

entrance to the defendant's apartment).  (Tr. 55.)  Deputy Davenport explained to

Mr. Green and Mrs. Green that he was going to get a search warrant, and that he was

going to contact the narcotics detective who was on call.  (Id. at 55-56.)  Mrs. Green

remarked to Deputy Davenport that he could look anywhere he wanted to because

she owned the land.  (Id. at 47, 56.)[9]

Given their remote location and the relatively large quantity of suspected

methamphetamine discovered, Deputy Davenport called for backup in the interest

of officer safety.  (Tr. 57-58.)  In the meantime, Cohutta Police Chief Ray Grossman

(responding to a call for a narcotics officer) arrived in his patrol car, as did two other

officers (Winkler and Giles) in their patrol cars.  (Id. at 58, 61-62, 74, 76.)[10]  Chief

Grossman testified that when he arrived at the scene, he asked Deputy Davenport,

"What do you have here?"  (Id. at 76.)  The deputy replied that a family member

found a bunch of drugs in the house.  Chief Grossman asked, "They let you in?"

Deputy Davenport replied, "Yes."  At that point, the chief asked the deputy to show

him what had been found and that he would conduct a field test and call the

---

[9] Deputy Davenport later learned that Mrs. Green lived in a trailer immediately adjacent to the barn that contained the defendant's apartment.  (Tr. 60.)

[10] Chief Grossman is also a deputized member of the Whitfield County Sheriff's Office.  (Tr. 66-67.)

investigator who was on his way to their location.  (<u>Id.</u>; <u>see also</u> <u>id.</u> at 80, 90.)
According to Chief Grossman, Mr. Green then spoke up and said that he and the
other officers already had been in the apartment and that it was "okay" for him to go
in as well.  (<u>Id.</u> at 80.)  Neither Mr. Green nor Mrs. Green objected to the entry of
this next group of officers into the defendant's apartment.  (<u>Id.</u> at 80-81, 90.)

Deputy Davenport took Chief Grossman and these two officers into the
defendant's apartment and showed them the suspected methamphetamine.  (Tr. 58,
61-62, 80.)  Chief Grossman reached into the open shoe box, pulled out a shard,
conducted a field test, and confirmed the substance as methamphetamine.  (<u>Id.</u> at 59,
62-63, 82-83.)[11]

### C.   <u>The Search Warrant</u>

After hearing from Deputy Davenport that methamphetamine had been
discovered in the defendant's apartment, Detective Holmes began an investigation
in order to obtain a search warrant.  (Tr. 12, 97.)  He traveled to the scene (arriving
about 3:34 p.m.), and spoke to Deputy Davenport, Chief Grossman, and Mr. Green.

---

[11] Both Chief Grossman and Whitfield County Detective R. Dewayne Holmes
(who obtained the search warrant that was subsequently executed at the defendant's
apartment) testified that the state magistrate judges in their county prefer to have
drugs field tested before they issue search warrants.  (Tr. 33, 83-84, 86.)

8

He entered an apartment (which he was told was the defendant's residence), observed the suspected methamphetamine in a shoe box, and learned that a field test had confirmed that the substance observed was methamphetamine. (Id. at 13, 15-16, 29, 30, 98.)[12] He placed this information into the application he made for a search warrant of the defendant's apartment. (Id. at 17, 98.)

Detective Holmes was careful to document the sequence of events that occurred at the defendant's residence because he was aware that the defendant might accuse officers of planting drugs there. (Tr. 35-36.) Thus, he knew that Deputies Davenport and Teems were the first to arrive on the scene after Mr. Green's 911 call, that the two deputies had entered the defendant's residence without a search warrant, and that the defendant was not present when that occurred because he was either being transported in an ambulance or already at a hospital. (Id. at 29-30.) Detective Holmes also learned that Chief Grossman, along with Officers Winkler and Giles, had also entered the defendant's residence without a search warrant. (Id. at 30.)

---

[12] The record shows that, at the point Detective Holmes entered the defendant's apartment, he had not yet prepared the affidavit he would submit to the state magistrate. (Tr. 30.)

9

With the addition of Detective Holmes' warrantless entry, six officers had been into the defendant's residence.  (Id.)[13]

The relevant portions of the search warrant affidavit and application are as follows:

> This affiant states that on April 25, 2010 at approximately 2:21 p.m., that Whitfield County 911 received a medical call from 362/364 Strain Road.  At approximately 2:25 p.m., Whitfield County 911 dispatched the Whitfield County Fire Department and Whitfield Emergency Medical Services to the above described residence.  At approximately 2:33 p.m., emergency services arrived at the above described residence.  At approximately 2:44 p.m., Whitfield County EMS transported a white male that identified himself as Paul Green to Hamilton Medical Center.

> At approximately 2:56 p.m., Whitfield County 911 received a telephone call from Matthew Green, and Mr. Green advised that he was locking up the above described residence [i.e., 364 Strain Road] and located drugs.  Whitfield County 911 then dispatched Whitfield County Sheriff's Office Deputies Jimmy Davenport and Lee Teems to the above described residence.

> At approximately 3:12 p.m., deputies arrived on the scene and Matthew Green advised that he went into the above described residence to lock up the residence and turn the lights off.  Upon entering the residence Matthew Green located a shoe box which contained what he believed

---

[13] Detective Holmes did not inform the state magistrate that six law enforcement officers had entered the defendant's residence by the time he applied for the search warrant.  (Tr. 31.)

to be drugs.  Matthew Green showed the suspected drugs to Deputy Davenport and Deputy Teems.[14]

Deputy Davenport then contacted this affiant and advised this affiant that a large quantity of Methamphetamine had been located at the above described residence.  Deputy Davenport advised that the residence was being secured by law enforcement at this time.

The suspected drugs were field-tested and did field-test positive for Methamphetamine.[15]

. . .

This affiant then checked Paul Green's criminal history and found that on 07-21-1999 he was arrested and convicted for distribution of Methamphetamine.

(Gov't Ex. 2 (bates nos. 47-48).)  Detective Holmes obtained the search warrant from the state magistrate, executed it, and made of an inventory of items seized.  (Tr. 17.)

Among the items seized was the suspected methamphetamine.  (Id. at 17-18; see also Gov't Ex. 2 (bates no. 52).)

---

[14] Detective Holmes did not inform the state magistrate that Matthew Green showed the deputies the drugs inside the defendant's residence.  (Tr. 31-32.)

[15] Detective Holmes did not inform the state magistrate that the field test occurred inside the defendant's residence.  (Tr. 32.)

11

### D.    The Green Family Compound

The testimony and the exhibits presented at the hearing establish that the defendant, his mother (Mrs. Green), and the defendant's nephew (Mr. Green) all live on what might be called a "family compound."  (Tr. 13-15, 79; Gov't Exs. 3-11.) Their residences are located by or at the end of a long driveway that connects to Strain Road.  (Tr. 16.)  As one turns in from Strain Road on to that driveway, Mr. Green's trailer sits on the right-hand side.  (Id. at 87.)[16]  At the end of the drive is a barn that contains an apartment in which the defendant lives.  To the left of that barn is a trailer in which Mrs. Green resides.  (Id. at 16-17, 72-73, 89.)  That trailer is not connected to the barn.  (Id. at 89.)  Mrs. Green's trailer is located much closer to the barn than Mr. Green's trailer.  (Id. at 87-88.)  The various residences have different Strain Road addresses–the defendant's apartment being 364 Strain Road, and his mother's trailer being 362 Strain Road.  (Id. at 90-91, 92-94, 95.)

Chief Grossman testified extensively about his familiarity with the Greens and their property.[17]  For instance, Chief Grossman not only drove by the Strain Road

---

[16] Mr. Green's trailer was not depicted on the photographs placed in evidence. (Tr. 87.)

[17] Chief Grossman's knowledge is immaterial to the legality of the initial entry, because he shared none of his knowledge with Deputy Davenport.

compound "about ten times a day," but also entered it on "several occasions" prior

to April 25, 2010, to answer domestic violence complaints, to respond to "lookouts

for vehicles," and in response to other "things like that." (Tr. 68, 87.) Based on his

observations during those visits and comments by family members, Chief Grossman

believed that the Strain Road compound was "family" property, that the defendant

and Mrs. Green were "both on the deed," and that "either" Mrs. Green "had some

kind of a thing on it–attached to it or [the defendant] had something attached to it

jointly or someone had power over something attached to it jointly or someone had

power over something." (Tr. 71-72.)[18]

Based his observations and conversations, Chief Grossman also believed that

Green family members, including Mr. and Mrs. Green, were ordinarily present on the

property and had a right to be there. (Tr. 71.) Additionally, Chief Grossman knew

that Mr. Green kept horses in the barn where the defendant's apartment was located,

believed that Mr. Green was authorized to come and go freely between his own

trailer, Mrs. Green's trailer, and that barn, and believed that "[t]hey," a reference to

_____

[18] Despite this speculative belief, the Government never presented a copy of
the actual deed to the property, something which could easily have been obtained
from courthouse records. The evidence that was presented conflicted. Mrs. Green
said she owned the property, while Chief Grossman speculated that both Mrs. Green
and the defendant were on the deed.

13

the defendant, Mr. Green, and Mrs. Green collectively, "shared the barn and the whole area." (Id. at 79; Gov't Ex. 3.)  Given his knowledge about the property and his familiarity with its occupants, Chief Grossman did not believe that Mr. Green needed anyone's permission to come onto or into the Strain Road property, because Mr. Green "used the barn and he had horses there and everything" and because "it's all family, you see them all around each other all the time anyhow." (Tr. 79.)

While Chief Grossman knew that the defendant lived in the barn's apartment inside the family compound on April 25, 2010, he also knew that the defendant's occupancy had been interrupted over the course of years. (Tr. 94).  Specifically, the defendant lived in that apartment "[o]ff and on for a while, unless he was away. . . serving time or something." (Id. at 90.)  During times when the defendant was away, "the family took care of everything," because the compound was, according to Chief Grossman, "a family thing." (Id. at 94.)  Based on this knowledge, Chief Grossman explained, "If I pulled up there, if the family was in each other's places, I wouldn't do anything because they all live on the same piece of property." (Id.)

Chief Grossman also knew about Mr. Green's relationship with the defendant.  For instance, he knew that Mr. Green was "raised around" the defendant and lived in a trailer located outside the compound, but on the property. (Tr. 77-79.)  Chief

14

Grossman likewise knew that, although Mr. Green worked for Auto Zone on April 25, 2010, Mr. Green had worked as a jailer in a juvenile facility.  (Id.)

## II.    THE INDICTMENT

On May 26, 2010, the Grand Jury returned a one count Indictment [1] charging that, on or about April 25, 2010, in the Northern District of Georgia, the defendant knowingly and intentionally possessed with intent to distribute and distributed more than fifty (50) grams of methamphetamine, a Schedule II controlled substance, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(A)(viii).  The Indictment also contains a forfeiture provision.

## III.    CONTENTIONS OF THE PARTIES

Defendant asks this Court to suppress all evidence seized from his residence, asserting that Deputy Davenport and others entered without a search warrant, and that the search warrant subsequently obtained by Detective Holmes was tainted by that prior illegal entry.  (Def.'s Br. [23] 6-13.)

The Government responds that the defendant's nephew (Mr. Green) and his mother (Mrs. Green) had either actual or apparent authority to invite Deputy Davenport and others into the defendant's residence; thus, their warrantless entry was lawful.  (Gov't Resp. [24] 19-28.)  Moreover, the Government asserts that, even if

15

the search warrant affidavit was tainted by information acquired from an unlawful entry, if that tainted information is stricken, the remaining information provides probable cause to support issuance of the search warrant. (Id. at 28-31.) Finally, the Government contends that, even if the search warrant was defective, the officers relied upon it in good faith under United States v. Leon, 468 U.S. 897 (1984). (Id. at 31-32.)

## IV.   ANALYSIS

### A.   The Search of the Defendant's Residence

The Fourth Amendment to the Constitution of the United States sets forth a general proscription on warrantless searches of a person's residence. See U.S. Const. amend IV ("The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated"). "Of all the places that can be searched by the police, one's home is the most sacrosanct, and receives the greatest Fourth Amendment protection." United States v. McGough, 412 F.3d 1232, 1236 (11th Cir. 2005); see also Payton v. New York, 445 U.S. 573, 585-86 (1980) (because physical entry of the home is chief evil against which the wording of the Fourth Amendment is directed, searches and seizures inside a home without a warrant are presumptively unreasonable).

16

However, the Fourth Amendment's prohibition of warrantless searches is not absolute. Although there is a strong preference for entries and searches conducted under the judicial auspices of a warrant, the Supreme Court has crafted a few specifically established and well-delineated exceptions to the warrant requirement. California v. Acevedo, 500 U.S. 565, 580 (1991); see also Brigham City, Utah v. Stuart, 547 U.S. 398, 403 (2006) ("because the ultimate touchstone of the Fourth Amendment is 'reasonableness,' the warrant requirement is subject to certain exceptions"). "Of course, the burden of proving an exception to the warrant requirement lies with the Government." United States v. Holloway, 290 F.3d 1331, 1337 (11th Cir. 2002) (citing United States v. Jeffers, 342 U.S. 48, 51 (1951)).

One of those exceptions is consent. Florida v. Jimeno, 500 U.S. 248, 250-51 (1991) ("[W]e have long approved consensual searches because it is no doubt reasonable for the police to conduct a search once they have been permitted to do so.") (citing Schneckloth v. Bustamonte, 412 U.S. 218, 219 (1973)). As noted above, the Government argues that its agents had consent to enter the defendant's apartment. Of course, that purported consent did not come from the defendant, but from his nephew, Matthew Green. The Court must, therefore, determine whether Matthew

17

Green could lawfully give Deputy Davenport consent to enter his uncle's apartment.[19]

In United States v. Matlock, 415 U.S. 164 (1974), the Supreme Court ruled that consent to search a private residence may be provided either by the individual whose property is searched or by "a third party who possesse[s] common authority over or other sufficient relationship to the premises." Id. at 171.  The Court defined "common authority" as "mutual use of the property by persons generally having joint access or control for most purposes. . . ."  Id. at 171 n.7.  In Matlock, consent to search the defendant's bedroom was provided by his live-in girlfriend.  Id. at 166-67.  The reason behind this rule is that, if a defendant "has already substantially ceded his expectation of privacy" to a third-party, then he "is thereby assuming the risk" that the third-party might expose his interest to others.  United States v. Shelton, 337 F.3d 529, 535-36 (5th Cir. 2003).

─────────────────

[19] The Government also asserts that Mrs. Green also provided consent to search her son's apartment.  However, Mrs. Green's comment that officers could search anywhere they wanted because she owned the land occurred after the initial warrantless entry.  Because the Court must focus on the facts available to Deputy Davenport "at the moment" he entered the residence, see Illinois v. Rodriguez, 497 U.S. 177, 188 (1990), what Mrs. Green may have said later is immaterial (as to both actual and apparent authority).

AO 72A
(Rev.8/82)

The Government submitted no probative evidence that Mr. Green had "common authority" over any or all of the defendant's apartment.  In other words, the Government did not show that Mr. Green enjoyed mutual use of the apartment or that he had joint access or control over it for most purposes.  Although Mr. Green lives nearby, keeps horses in the barn in which the apartment is located, and moves freely across the family compound, there was no evidence that he lived in the apartment, had a key to it, or exercised any dominion over it.  Locking the apartment's door or turning out its lights in the defendant's absence is insufficient indicia of mutual use, access, or control.  Because Mr. Green was not a third party who possessed common authority over or other sufficient relationship to the premises, he could not provide consent for its search.  Matlock, 415 U.S. at 171; see also United States v. Aguila, 91 F. App'x 587, 589 (9th Cir. 2004) (defendant's nephew who lived in separate residence but who stored property in his uncle's home and had access to it lacked actual authority to consent to a search).  Thus, the Government failed to meet its burden of establishing that Mr. Green had "common authority" over the defendant's home.  Rodriguez, 497 U.S. at 181-82.

The Government next argues that, even if Mr. Green did not have actual authority to consent to the search of the apartment, officers reasonably believed that

he had apparent authority to do so.  (Gov't Br. 25-28.)  "The Supreme Court has held

that a warrantless entry is valid when based upon the consent of a third party whom

the police, at the time of entry, reasonably believed possessed common authority

over the premises, even if the third party does not in fact possess such authority."

United States v. Fernandez, 58 F.3d 593, 598 (11th Cir. 1995) (citing Rodriguez, 497

U.S. at 188-89).[20]

The "determination of consent to enter must be judged against an objective

standard:  would the facts available to the officer at the moment . . . warrant a man

of reasonable caution in the belief that the consenting party had authority over the

premises?"  Rodriguez, 497 U.S. at 188 (citation and internal quotation marks

omitted) (alteration in original); see also United States v. Williams, 139 F. App'x

215, 217-18 (11th Cir. 2005) (citing Rodriguez for proposition that "officers do not

violate the Constitution when they enter a residence because they reasonably, but

_____

[20] In Rodriguez, the defendant's girlfriend, who had not lived at the searched residence for several months, offered to take officers to what she called "our" apartment so they could arrest the defendant.  Rodriguez, 497 U.S. at 179.  The officers did not inquire as to whether the girlfriend still resided there, but instead followed her to the apartment, received her permission to enter, then arrested the defendant.  Id. at 180.  The Supreme Court ruled the evidence seized did not have to be suppressed, because the officers reasonably, albeit erroneously, believed the girlfriend had authority to consent to the entry and search.  Id. at 185-86.

20

erroneously, believe that the person who consented to their entry and the search was a resident of the premises and had the authority to consent").

Rodriguez placed some responsibility on the officer to assess the situation he faces critically:  "Even when the invitation is accompanied by an explicit assertion that the person lives there,[21] the surrounding circumstances could conceivably be such that a reasonable person would doubt its truth and not act upon it without further inquiry."  Rodriguez, 497 U.S. at 188.  This duty of inquiry is triggered, for example, when the officer obtains information that is subject to differing interpretations.  See United States v. Waller, 426 F.3d 838, 847 (6th Cir. 2005) ("a number of other courts have also recognized an officer's duty to inquire in ambiguous situations"); United States v. Chun Yen Chiu, 857 F. Supp. 353, 361 (D.N.J. 1993) ("Where police officers are faced with an ambiguous situation, unless further inquiry is made which determines that the property about to be searched is subject to 'mutual use' by the person giving consent, it is unlawful to enter without a warrant.").

---

[21] Of course, the instant case is different from Rodriguez in that Mr. Green made no assertion that he lived in the apartment.  Instead, he made clear that his uncle resided in the apartment.

In this case, it is undisputed that Mr. Green invited Deputy Davenport to enter his uncle's apartment. However, it would be unreasonable for "law enforcement agents to believe in every instance that someone who invites them into a home or a room is authorized to do so." United States v. Rosario, 962 F.2d 733, 738 (7th Cir. 1992). The Rosario court applied the "further inquiry" language from Rodriguez to suggest that, "in the absence of sufficient facts, officers have a duty to seek further information in order to determine whether they may reasonably infer that the inviter has the necessary authority to consent to an entry or search of the premises." Id. Given the situation he faced, including his knowledge that Mr. Green did not reside in the apartment, Deputy Davenport had a duty to make further inquiry before accepting that invitation.

The case of United States v. Reid, 226 F.3d 1020 (9th Cir. 2000), is instructive here. In that case, investigating officers knocked on an apartment door, which was answered by a man later identified as Junior Grant. Id. at 1023. Prior surveillance had not identified Grant as having any connection to the apartment. Id. at 1022-23. After questioning Grant at the door and smelling the odor of burning marijuana, an officer displayed his badge and identified himself as a federal agent. In response, Grant slammed and locked the door; other agents watching the apartment's rear door

22

saw Grant exit and detained him.  Id. at 1023.  When asked for identification, Grant stated that his license was inside the apartment, and in response to further questions, stated that no one else was inside.  The officers asserted that Grant gave them permission to enter the apartment to retrieve his identification and to make sure that no one else was inside.  Id.  Officers went inside and observed incriminating materials (i.e., firearms and drugs).  One officer then left to obtain a search warrant. Id.  Other individuals who arrived at the apartment later that day were arrested. Following indictment, the defendants filed motions to suppress the fruits of the warrantless search of the apartment, which were denied.  Id. at 1024.

On appeal, the Government argued that Grant had apparent authority to consent to the search because he had answered the front door and appeared to be alone in the apartment.  Reid, 226 F.3d at 1025.  The Ninth Circuit rejected that argument, finding that the evidence was "insufficient because 'the mere fact of access, without more, does not indicate that the access was authorized.'"  Id. (quoting United States v. Dearing, 9 F.3d 1428, 1430 (9th Cir. 1993)).[22]  Moreover, the

---

[22] In Dearing, the court held that the police acted unreasonably in assuming that a live-in caretaker and occasional housekeeper who had authority over common areas of house also had use of, access to, or control of the defendant's bedroom. Dearing, 9 F.3d at 1430.

23

surrounding circumstances indicated that a reasonable person would not presume,

without further inquiry, that Grant resided in the apartment, especially since prior

surveillance had not connected Grant to it. Id. at 1025-26.  According to the court:

> In light of Deputy Kitts's knowledge about the residents of the apartment and the surrounding circumstances, it was not objectively reasonable to believe that Grant resided in the apartment simply because he opened the door and appeared to be alone.  We are mindful that "mere access" to a residence, without more, is insufficient to establish apparent authority.  Dearing, 9 F.3d at 1430.  Here, other than access, the officers had no reason to believe that Grant lived in the apartment.  Indeed, the officers should have asked Grant if he lived in the apartment before they entered the apartment to conduct the search.  They failed to do so.  Thus, the determination that Grant had authority to consent to the search simply because he answered the door to the apartment was not objectively reasonable.  Accordingly, we conclude that the district court erred in ruling that Grant had apparent authority to consent to the search.

Id. at 1026.

In another instructive case, United States v. Whitfield, 939 F.2d 1071 (D.C.

Cir. 1991), the court found unconstitutional a search where FBI agents obtained

consent from the adult defendant's mother, who owned the home where he lived.  Id.

at 1072.  Even though the agents inquired as to whether the defendant paid rent on

the bedroom and were told that the room was open and not locked, the court found

that whether the mother had "mutual use of the room or the closet [where agents

24

found evidence] could not be determined from anything the agents asked." Id. at 1072, 1074.  For example, the FBI "agents never asked [the defendant's mother] whether she cleaned her son's room, visited with him there, stored any of her possessions in the room, watched television there, or made use of the room at any time for any purpose." Id. at 1074.

In the instant case, there is no evidence of facts available to Deputy Davenport that would have allowed him reasonably to conclude that Mr. Green had mutual use of his uncle's apartment. See Whitfield, 939 F.2d at 1074 (citing Matlock, 415 U.S. at 171 n.7).  Rather, Deputy Davenport encountered a man who had access to the defendant's apartment (because it had apparently been left unlocked when EMS departed with him).  However, like in Reid, Dearing, and Whitfield, supra, the mere fact of access, without more, does not indicate that the access was authorized.  See also United States v. Cos, 498 F.3d 1115, 1130 (10th Cir. 2007) ("government must offer more evidence than the third party's presence on the premises" to show apparent authority to consent to search).  There was no evidence that the defendant had authorized his nephew to come and go freely into his apartment.  Moreover, what Deputy Davenport did know–that the apartment belonged to Mr. Green's

25

uncle–would have led a reasonable person to make further inquiry into whether the nephew had authority to allow strangers to enter.[23]

This Court thus concludes that, based on the facts available to Deputy Davenport at the time he entered, a person of reasonable caution would <u>not</u> have believed that Mr. Green had authority over the defendant's apartment.  At the time Mr. Green invited Deputy Davenport in, the officer knew that the apartment belonged not to him but to his uncle.  He also knew that the defendant had been taken to the hospital and would not be coming back soon, and that as Mr. Green was

---

[23] The Government cites <u>United States v. Almeida-Perez</u>, 549 F.3d 1162 (8th Cir. 2008), and <u>United States v. Janis</u>, 387 F.3d 682 (8th Cir. 2004), as persuasive authority for the proposition that it was reasonable for Deputy Davenport to enter the defendant's apartment because Mr. Green issued an invitation.  (Gov't Br. 26-27.) Neither case controls.  In <u>Janis</u>, a friend of the defendant entered the house without knocking, gestured for the police to follow her in, and referred to a room as "her room."  387 F.3d at 687.  The Eighth Circuit held that the police did not violate the Fourth Amendment because they "had no reason to doubt [that friend's] authority to invite them into the house."  <u>Id.</u>  Here, in contrast, Mr. Green never represented that the apartment was his.  In <u>Almeida-Perez</u>, the evidence showed that the defendant's cousin had been seen by officers going into and out of the house without knocking, he was reposing on the front porch, he invited the officers in without asking anyone's leave, and he preceded them in without knocking.  549 F.3d at 1171. The court held that police reasonably relied on the defendant's cousin's apparent authority to admit them into the defendant's house.  <u>Id.</u>  Although Mr. Green did invite the officers in here without asking anyone's permission, officers had not seen him going in and out of the apartment as if it had been his own.  Indeed, he disclaimed residence in the apartment.

locking up the apartment and making sure nothing had been left on, he tripped over a shoe box located under the corner of the defendant's bed and found what he suspected were drugs. Although Deputy Davenport conceded that these statements were an indication that the apartment belonged to the defendant and not to Mr. Green (Tr. 60), he did not make further inquiry whether Mr. Green had permission to allow others into the apartment. Accordingly, because officers could not reasonably conclude that Mr. Green had apparent authority to consent to a search, the Government has also failed to carry its burden of establishing this exception to the warrant requirement.

Mrs. Green's comment that officers could search anywhere they wanted because she owned the property is immaterial because it came after the initial warrantless entry. Although the Government refers to Mrs. Green as the "caretaker" of the property (<u>see, e.g.</u>, Gov't Br. 21), given her relatively advanced age, it would be a stretch to call her the caretaker of anything. Instead, the record shows that family members "took care of . . . grandma's trailer." (Tr. 94.) In any event, even if Mrs. Green were the property's caretaker, there was no evidence that she had been entrusted with authority over the defendant's apartment, which was his exclusive living quarters. (<u>See</u> Gov't Br. 22; Tr. 90.)

27

The Government presented testimony from Chief Grossman about his knowledge of the Green family compound, how its residents "came and went freely" about the property, and his belief that both Mrs. Green and the defendant "were on the deed." (Tr. 71-73, 79, 94-95.)  Chief Grossman's knowledge cannot be imputed to Deputy Davenport.  That deputy entered the defendant's residence first, well before the Chief arrived, and did so without talking to him.  Thus, any "collective knowledge" officers may have had about the Green family compound is immaterial. In any event, the information Chief Grossman had would have led a reasonable person not to enter, as it was clear to the Chief that the apartment was the defendant's residence, not his nephew's.

### B.   The Exclusionary Rule Applies

Having determined that the warrantless entry into the defendant's apartment violated the Fourth Amendment, the Court must consider whether the results of the subsequent search, conducted after a search warrant was finally obtained, should be suppressed under the exclusionary rule.[24]  This Circuit's precedents are clear:

---

[24] The exclusionary rule operates to prevent the government from using evidence seized as the result of an illegal search in a subsequent criminal prosecution.  United States v. Martin, 297 F.3d 1308, 1312 (11th Cir. 2002); see also Wong Sun v. United States, 371 U.S. 471, 485, 488 (1963) (under fruit-of-the-poisonous-tree doctrine, evidence obtained as a result and by exploitation

28

> [W]here, as here, the search warrant affidavit is based on information acquired as a result of an illegal entry, we must look to whether the other information provided in the affidavit is sufficient to support a probable cause finding.  United States v. Glinton, 154 F.3d 1245, 1254-55 (11th Cir. 1998).  If so, suppression is not required because "the exclusionary rule has no application where the government learned of the evidence from an independent source," id. at 1255, provided, of course, that "the agents' decision to seek the warrant was [not] prompted by what they had seen during the initial entry. . . ." Murray v. United States, 487 U.S. 533, 542, 108 S. Ct. 2529, 101 L.Ed.2d 472 (1988).

United States v. Chaves, 169 F.3d 687, 692 (11th Cir. 1999).

Here, the search warrant affidavit is based on information acquired during the illegal entry in addition to other information that appears sufficient to support a probable cause finding.  However, the decision to seek the search warrant here was the direct result of the observations the officers made inside the apartment after their unlawful entry, and not the result of the independent information.  Prior to his entry, there is no evidence that Deputy Davenport intended to seek a search warrant, even though he had been informed by Mr. Green about the methamphetamine found in the shoe box.  It was only after the deputy entered the house and saw the drugs that he decided to clear everyone out and seek a search warrant.

---

of an illegal search subject to exclusion).

The district court in <u>United States v. Ortega</u>, No. 2:07-cr-76-FtM-29DNF, 2007 WL 3306612 (M.D. Fla., Nov. 6, 2007), applied the above precedent in a manner applicable to the instant case:

> Here, the decision to seek the search warrant was the direct result of the observations and smells the officers made inside the residence after their unlawful entry. Officer Perez testified that prior to entry they did not intend to seek a search warrant, even though they could smell marijuana. (Doc. # 41 at 64, 66.) It was only after they entered the house that a decision was made to seek a search warrant. The temporal proximity of the entry and the decision to call superior officers was immediate. The decision to obtain a search warrant was also in close proximity to the entry, and was motivated only by the contents of the house, not the initial smell of marijuana from the door step. Thus, this is not a case like <u>Segura [v. United States]</u>, 468 U.S. [796,] 814-15 [(1984)], where none of the information on which the warrant was secured was derived from or related in any way to the initial entry in the residence.

> Since the decision to obtain a search warrant is tainted, the Court need not review the search warrant affidavit after redaction of tainted evidence. All evidence obtained pursuant to the search warrant must be suppressed.

<u>Ortega</u>, 2007 WL 3306612, at *5.

In this case, as in <u>Ortega</u>, the temporal proximity of the entry and the decision to call for a narcotics officers was immediate. The decision to obtain a search warrant was also in close proximity to the entry, and was motivated only by the contents of the shoe box, not the initial encounter with Mr. Green, who clearly

30

informed both 911 and Deputy Davenport that he had seen a large quantity of methamphetamine in his uncle's apartment.  As noted by the Ortega court, the instant case is not like Segura, 468 U.S. at 814-15, where none of the information on which the warrant was secured was derived from or related in any way to the initial entry in the residence.  Since the decision to obtain a search warrant is tainted, the Court need not review the search warrant affidavit after redaction of tainted evidence.  All evidence obtained pursuant to the search warrant must be suppressed.[25]

---

[25] In Murray, the Supreme Court explained the policy basis for suppressing evidence where probable cause existed before the illegal entry.  If law enforcement officers with probable cause were allowed to "enter without a warrant to make sure that what they expect to be on the premises is in fact there," they would routinely do so because if the evidence were not there, "they will have spared themselves the time and trouble of getting a warrant; if it is, they can get the warrant and use the evidence despite the unlawful entry."  487 U.S. at 539.  However, the Supreme Court cautioned,

> An officer with probable cause sufficient to obtain a search warrant would be foolish to enter the premises first in an unlawful manner.  By doing so, he would risk suppression of all evidence on the premises, both seen and unseen, since his action would add to the normal burden of convincing a magistrate that there is probable cause the much more onerous burden of convincing a trial court that no information gained from the illegal entry affected either the law enforcement officers' decision to seek a warrant or the magistrate's decision to grant it.

Id. at 540.

31

**C.**     **The Leon Exception Does Not Apply**

In United States v. Leon, 468 U.S. at 897, the Supreme Court articulated a good faith exception to the exclusionary rule, holding that the rule should be modified so as not to bar the use in the prosecution's case in chief of evidence obtained by officers acting in reasonable reliance on a search warrant issued by a detached and neutral magistrate but ultimately found to be unsupported by probable cause. Id at 900.  Since the purpose of the exclusionary rule is to deter unlawful police misconduct, when officers engage in an "objectively reasonable law enforcement activity" and act in good faith and in reliance on a search warrant from a judge, the Leon good faith exception applies.  Martin, 297 F.3d at 1313 (exclusionary rule is meant to guard against police officers who purposely leave critical facts out of search warrant affidavits because these facts would not support a finding of probable cause).

In this case, however, it was not an "objectively reasonable law enforcement activity" but rather the officers' unlawful entry into the defendant's apartment that led to Detective Holmes's request for a search warrant.  In such a situation, "the search warrant affidavit was tainted with evidence obtained as a result of a prior, warrantless, presumptively unlawful entry into a personal dwelling." United States

32

v. Meixner, 128 F. Supp. 2d 1070, 1078 (E.D. Mich. 2001); see also U.S. v. Mowatt 513 F.3d 395, 405 (4th Cir. 2008) ("Leon exception does not apply here because Leon only prohibits penalizing officers for their good-faith reliance on magistrates' probable cause determinations.  Here, the exclusionary rule operates to penalize the officers for their violation of [the defendant's] rights that preceded the magistrate's involvement."); United States v. Reilly, 76 F.3d 1271, 1280 (2d Cir. 1996) (declining to apply the good faith exception when the "issuance of the warrant was itself premised on material obtained in a prior search that today's holding makes clear was illegal"); United States v. Wanless, 882 F.2d 1459, 1466 (9th Cir. 1989) (noting that "good faith exception does not apply where a search warrant is issued on the basis of evidence obtained as the result of an illegal search").

Because the officers were not permitted to enter the defendant's apartment under the circumstances without a warrant and without his consent, the undersigned finds that the exclusionary rule is applicable and the Leon good faith exception does not apply.  The evidence obtained as a result of the police officers' unlawful entry into the defendant's apartment should be suppressed.  Hudson v. Michigan, 547 U.S. 586, 590 (2006).

33

## V.   <u>CONCLUSION</u>

For the reasons stated above, the undersigned **RECOMMENDS** that defendant's Motion to Suppress Evidence [12] be **GRANTED**.

**SO RECOMMENDED**, this 6th day of October, 2010.

_____
WALTER E. JOHNSON
UNITED STATES MAGISTRATE JUDGE

34

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ROME DIVISION

UNITED STATES OF AMERICA

CRIMINAL ACTION FILE

v.                                      NO. 4:10-CR-21-RLV-WEJ

PAUL EDWARD GREEN,

Defendant.

**ORDER FOR SERVICE OF**
**NON-FINAL REPORT AND RECOMMENDATION**

Let this Non-Final Report and Recommendation of the United States Magistrate Judge, made in accordance with 28 U.S.C. § 636(b)(1)(B) and the Court's Local Criminal Rule 58.1(A)(3)(a), be filed and a copy, together with a copy of this Order, be served upon counsel for the parties.

Pursuant to 28 U.S.C. § 636(b)(1), each party may file written objections, if any, to the Non-Final Report and Recommendation within fourteen days of the receipt of this Order.  Should objections be filed, they shall specify with particularity the alleged error(s) made (including reference by page number to any transcripts if applicable) and shall be served upon the opposing party.  The party filing objections will be responsible for obtaining and filing the transcript of any evidentiary hearing

for review by the District Court.  If no objections are filed, the Non-Final Report and

Recommendation may be adopted as the opinion and order of the District Court, and

any appellate review of factual findings will be limited to a plain error review.

United States v. Slay, 714 F.2d 1093, 1095 (11th Cir. 1983) (per curiam).

The Clerk is directed to submit the Non-Final Report and Recommendation

with objections, if any, to the District Court after expiration of the above time period.


**SO ORDERED**, this 6th day of October, 2009.


Walter E. Johnson

WALTER E. JOHNSON
UNITED STATES MAGISTRATE JUDGE

2